UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRISTINE M. ALEXANDER, 2012 SEP 14  P 12: 16

Plaintiffs, DISTRICT COURT
DISTRICT OF MASS.

Civil Action No: 09-10776-JLT

v.

LUIS S. SPENCER,
LAWRENCE WEINER,
ROBERT DEINER,

Defendants.

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR THE APPOINTMENT OF AN INDEPENDENT GID EXPERT TO CONDUCT AN INDIVIDUALIZED ASSESSMENT FOR PLAINTIFF'S NEEDS

Now comes Christine M. Alexander, pro se plaintiff, in the above-captioned civil action and respectfully submits this memorandum in support of said motion.

As further support for the motion, plaintiff submits the following law found on the LEXIS computer system in the MCI_Norfolk law library.

"Adequacy of care for a GID inmate is that care which is sufficient to diminish an inmate's emotional distress, and any related risks of suicide and self mutilation such that the inmate would no longer be at a substantial risk of serious harm." 2009 US DIST LEXIS 131002 Brugliera v Comm'r of Corr's (1st cir. December 16, 2008).

The medication treatment the DOC is providing for my gender dysphoria is seriously inadequate since I continue to suffer from hot flashes and night sweats, penile and testicle sensitivity/enlargement, nightly erections, breast shrinkage, scalp hair-loss and body hair regrowth, moodiness and severe depressive episodes. For five years, all these distressing symptoms have prevented me from dealing with situational stressors adequately, and has greatly reduced my mental health and

(2)

stability.

Because I know my body and it's history dealing with these medications personally, I know without a doubt, and can prove to His Honor, that generic drugs are inadequate for my hormone regimen since I, in fact, continue to suffer from these symptoms that the name brands Aldoctone, and Proscar are proven to effectively suppress. They are used for the treatment of GID because of their awesome ability to effectively suppress anti-androgens that cause horrible male characteristics.

In the First Circuit of Maine, Ims Health v Ayotte 490 F Supp 2d 163 (D.M.E. April 30, 2007), His Honor, Judge Barbadoro said in his decision that, "Not all new drugs are harmful, and generic drugs are not always as effective for all patients as brand name alternatives." In footnote #5, Id, His Honor also says, "In some circumstances, a brand name drug may be preferable to a bioequivalent generic alternative. This is primarily because generic drugs are not subjected to the rigorous study and testing as brand name drugs. They may have unknown side effects, and bioequivalent generic alternatives need only demonstrate absorption parameters falling between 80 and 125 percent of those obtained by their branded counterparts. As a result, individual responses to treatment may vary significantly. For example, when patients switch from a brand name drug to a generic drug, there is a risk that the patient will absorb significantly more or less of the medication than the patient was absorbing from the branded drug. Additionally, because there may be numerous generic producers of a single brand name drug, with each generic, response to treatment may vary substantially depending on the generic alternative the pharmacist has in stock on a particular day. In treating epilepsy, for example, these variations may result in the patient experiencing seizures. That might have been avoided if the absorption rate had remained steady," IMS Health v Ayotte 490 F Supp 2d 163, 181-182 (D.M.E. April 30, 2007)

Later, in IMS Health Corp. v Rowe 532 F Supp 2d 183 (D.N.H. January 2, 2008), His Honor, Judge Woodcock agreed with Judge

Barbadoro's earlier 2007 Ims Health v Ayotte opinion, "This court agrees. The evidence establishes that 'not all new drugs are harmful and generic drugs are not always as effective for all patients as brand name alternatives.'" Judge Woodcock also explained that prescription drug information intermediaries, (PDIIs), argue that, "For many conditions and many patients, variations in bioequevalence between the branded and generic drugs make no therapeutic difference. However, for some medical conditions the therapeutic window is extremely narrow, and the substitution of a generic drug for a patented drug can have devistating health consequences." During the trial, Dr. Andrew Card, Director of the Mass. Gen. Hosp. Epilepsy Service, and Dr. Thomas Wharton, a cardiologist, tetified in court about medical conditions they routinely treat that require branded, not generic, drugs. They confirmed that occasionally the improper substitution of generic for branded drugs can cause medical catastrophies.[11]"490 F Supp 2d 163

In 2004, I started on the name brand drug Lupron to reduce testosterone. The endocrinologist had me on a complete testosterone suppression regimen. I was on the Lupron for about two years resulting in a fantastic clinical response!! The testosterone numbers had dramatically dropped to virtually being undetectable. In 2005, the testosterone numbers read: total testosterone was 18. Free testosterone was .02%. I looked and felt great! It was as if I were castrated. Then, sometime in 2007, the DOC pharmacy switched me to the generic version of Lupron causing my body to eventually degrade into all the symptoms previously mentioned. It was devistating to see myself fall apart. I was distressed and frantically complained, crying with tears to my therapist who did not understand why those symptoms were so upsetting. Eventually, in 2009, the DOC health services unit took blood, which revealed a serious spike in testosterone. The total testosterone jumped to 74. The free testosterone leapt to 2.00%!!!

Eventually, an endocrinologist ordered, "Aldactone" 200 mg daily. Aldactone is the brand name for the drug spironolactone. Spirinolactone, not Aldactone was approved and sent. Sometime later, a physician ordered, "Proscar" 5 mg daily. Proscar is the brand name for the drug finasteride. By the time finasteride, not Proscar, was approved because of the instant civil action, the pharmacy had already changed the generic spironolactone brands three different times. When the generic finasteride, and not the Proscar, eventually showed up, the DOC pharmacy changed the spironolectone brand yet again. As these generic drugs changed, so too did my body. It was like being on a roller coaster with no one to hear the helpless screams of panic and horror.

Because of the generic changes, on January 15, 2010, my total testosterone was 27. Free testosterone .60%. On November 4, 2011, my total testosterone was 36. Free testosterone .50%. On February 9, 2012, my total testosterone was 43. Free testosterone .30%. (These numbers were transcribed from the U/Mass computer screen during a doctor visit). One can clearly see how dangerously close the current total testosterone number was getting to the previous total testosterone 74. As the generics got cheaper, the drugs got weaker. I must also mention that there were no changes in either diet or daily activity, except for medication changes.

In the First Circuit of Appeals, Ims Health inc v Ayotte 550 f 3d 42,60 (1st cir. February 18, 2008), both Judge Selya, and Judge Siler said, "Physicians prescribe medications for individuals on the basis of a multitude of factors. A generic drug, whether or not bioequivalent, will rarely be capable of being recommended across the board as a substitute for a name brand drug because each drug offers subtly different situation-specific advantages. The physician must attend to the patient's individual symptoms, make a diagnosis, and prescribe accordingly." Ims Health inc. v Ayotte 550 f 3d 42, 60 (1st cir. February 18, 2008).

In her dissent, Judge Lipez offered in footnote 20, that, "Even 'bioequivalent' generic drugs are not identical to their branded counterparts. They are required to demonstrate absorption

capability between 80 and 125 percent of the branded version, and variations in absorption may trigger different side effects when patients switch from the brand name drug to a generic version. In addition, because there may be multiple generic options, a patient may experience different reactions depending upon which generic alternative is dispensed. For some patients, these variations could have significant impact making continued use of the brand name drug the best approach." In footnote 49, Judge Lipez also notes that," It is worth noting that some patients inevitably must be exposed to the risks of trying new drugs because it is through use by patients after more limited clinical testing, that side effects and other problems are detected." Ims Health inc v Ayotte 550 f 3d 42 (dissent),(1st cir. November 18, 2008).

One can clearly see that these cases support my argument for His Honor.

The WPATH 7th version, at page 8-9 says: "Ultimately, the level of treatment that a patient requires depends on the severity of their GID diagnosis, and the treatment of gender dysphoria has become more individualized with the adoption of the seventh version of the standards of care."

The diagnostic Statistical Manual, (DSM), version iv at 537 and 538, it explains that, "Individuals with GID experience persistent discomfort with their sex or sense of inappropriateness in the gender role of that sex and in adults the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary characteristics."

I continue to experience persistent discomfort with my testicles, deep voice, body hair, scalp-hair loss, -all secondary male characteristics... Once, I was on a very powerful anti-androgen that eliminated all body hair, stopped and reversed scalp hair-loss, greatly reduced penis and testicle size, eliminated nightly erections, gave me very large breasts, and fatty hips. Ever since the change to the generic drugs and their

inadequate versions, I have slowly and painfully regressed.

In Fields v Smith 712 F Supp 2d 830 (D.WIS. May 13, 2012),
Three plaintiff's hormone treatment were slowly withdrawn because
the newly passed Act 105 prevented prisoners from getting
treatment for GID. Each of the plaintiffs experienced this: Fields
suffered from nausea, muscle weakness, loss of appetite, increased
(body) hair growth, skin bumps,, and depression; Davison suffered
from increased and darker (body) hair growth, voice deepening,
breast reduction and leakage, moodswings and mental instability,
hot flashes, and depression; Moaton (re)grew chest hair and facial
hair,...skin break-outs, hot flashes, and depression. After the
Seventh Circuit affirmed the District Judges decision in favor of
plaintiffs, the DOC reinstated the hormone therapy and thereafter,
the symptoms were abated.

In these prisoner's hormone withdrawal symptoms, one can see
the similarities with my own numerous complaints. As the drugs got
withdrawn, or weaker, the same symptoms each of us complained
about occurred.  Using generic drugs in my body is like being
withdrawn from hormone therapy.

In the Seventh Circuit of Appeal's affirmed decision in
Fields v Smith, Her Honor, Judge Joan B. Gottschall said, "When
hormones are withdrawn from a patient who has been receiving
hormone treatment, severe complications may arise. The dysphoria
and associated symptoms may resurface in more acute form." 653 f3d
550 Fields v Smith (7th cir. February 7, 2011).

Healthy participation in prison activities are nearly
impossible as the moodswings interfere. I lack the confidence I
previously enjoyed while the testosterone levels were adequately
suppressed for my individual needs. Before the drug changes, I was
able to fend off prison predators with more ease since my inner
strength usually intimidated them. After the switch to generic
medications, and different changes in their brands, I've greatly

declined in both appearance and mental health, causing me to make bad decisions to where many prisoners and staff have been upset with me at one time or another.

These bad choices of mine, coupled with denying other's sexual advances, have indeed caused prisoners to get me into trouble with staff. They used tactics of horrible and disgusting rumors, gossip, and bad intelligence in an attempt to having me removed from the unit. One such time, during the month of May 2012, false accusations were written in a letter to DOC central where I was accused of receiving female items from staff; consequently, I was lugged to the hole. Five days later I was put back in my original cell because the staff realized it was untrue. I still received a d-report as some of the things confiscated were home-made gaffs and underwear. As a result of the lug, I also lost a lot of clothing I've had for many years and wore to maximize my femaleness. They were a great loss for my gender dysphoria.

Making stupid choices has also led me to allow a known sexual predator to abuse me mentally to where I feared him, and because we lived in the same unit, avoiding him was impossible. He recently assaulted me with the intent to rape, which led to a PREA investigation. After the investigation, the DOC staff held me accountable because I didn't report him, and that the incident occurred in his cell. I received a d-report for being out of place and engaging in sexual activity. The administration placed me in a more restrictive and less privileged unit that houses the most aggressive prisoners in the facility. The staff said they wanted to keep a close eye on me for my own protection. I was treated as a victim, yet being punished with a ticket. The falseness of the accusation is highly upsetting because I'm under oath in a deposition in Kosilek v. Dennehy saying I'm not sexually active.

These incidents are only a couple of examples that I've found myself in as a result of my serious lack of confidence.

"The United States contends that differences in inactive ingredients between two products with the same active ingredients

can materially affect the safety and effectiveness of the medication; that the "same" active ingredient from different sources may cause different effects; and that even if all ingredients are the same, differences in manufacturing practices can cause one manufacturer's product to differ sudstantially from another in safety and effectiveness." 511 F Supp 958, 961 United States v Premo pharmaceutical Laboratories (D.N.J. January 20, 1981). "Bioavailability can be affected by environmental factors, humidity during manufacturing can cause problems ranging from simple discoloration to subpotency." 511 F Supp 965

Medical staff for the DOC are aware of my serious medical need for gender dysphoria treatment. However, my many complaints have largely gone ignored to where the GID committee sends me to an endocrinologist who only looks at my breasts, takes blood, and ignores the horrible male symptoms I described. I told him everything, yet he chose to ignore the symptoms. He sent me on my way explaining that I was fine and he'd see me in four months.

In Greeno v Daley 414 F 3d 645 7th cir. November 1, 2004, the case says: "First of all, there is no requirement that a prisoner provide "objective" evidence of his pain and suffering-self reporting is often the only indicator a doctor has of a patient's condition." See Cooper v Casey 97 F 3d 914, 916-17 (7th Cir. 1996). (the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it...Subjective, non-verifiable complaints are in some cases the only symptoms of a serious medical condition.")

In spite of the fact that the GID committee is giving me some medical treatment, they are ignoring my symptoms that are both "subjective", and "objective". Their endocrinologist has ignored the symptoms I've described to him by only looking at my breasts and taking blood. He did not test for testosterone levels.

"To prevail on an Eighth Amendment claim, a prisoner is not required to show that he was literally ignored." Greeno v Daley 414 F 3d 645, 653-54 (7th cir. 2005), quoting, Sherrod v Lingle 223 F 3d 605, 611 (7th cir. 2000). "On the other hand a defendant's medical care claim fails because the prisoner 'received some treatment over-looks the possibility that the treatment the prisoner did receive was inadequate.'" Greeno v Daley 414 F 3d 645, 653 (7th cir. November 1, 2004).

The GID committee knew of my continued symptoms from my GID therapist who explained that he too believes that not all generics are the same, and that I should receive brand-name drugs for my hormone replacement therapy. Dr. Deiner, who is the head of the committee, approved the use of non-generic medications by his, "not being opposed to [me] receiving Aldactone".

"The fact that a prisoner received some medical treatment does not necessarily defeat his claim; deliberate indifference to a serious medical need can be manifested by 'blatant inappropriate' treatment, Greeno v Daley 414 F 3d 645, 654 (7th cir. 2005), or by 'woeful inadequate action' as well as by no action at all." Reed v McBride 178 F 3d 849, 854 (7th cir. 1999).

Woe, as defined in the American Heritage College Dictionary, is deep distress and misery, as from grief. My constant anguish from hot flashes and night sweats, penile and testicle sensitivity/enlargement, nightly erections, breast shrinkage, scalp hair-loss and body hair regrowth, moodiness and severe depressive episodes cause me deep distress and misery. All these symptoms would cause any woman considerable woe, especially hair-loss. In effect, the treatment I am getting for gender dysphoria is inadequate. The drugs the pharmacy continues to send are truly ineffective causing me to suffer both physically, and mentally.

The question I ask His Honor to consider, is, "Why do the DOC pharmacy stock both the generic and branded versions of the same

drug?" It seems to me that sometimes generic alternatives are not effective for all patients and sometimes the branded version is more appropriate.

The nurses in the hospital unit has explained to me that the doctor can prescribe non-generic medications where the pharmacy must honor it; and that it's only done when needed... Well, I contend that this is one of those needed moments to properly treat my individualized medical need.

In the case of Leavitt v Correctional Medical Services 645 F 3d 484, 497 (February 29, 2011), they noted that "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination";"Similar evidence including evidence of adverse effects, may be relevant to both components." Smith v Carpenter 316 F 3d 178, 187 n-12 (2nd cir. 2003) (Citing Desrosiers v Moran 949 F 2d 15, 18-19 1st cir. 1990).

Also in, Brock v Wright 315 F 3d 158 at 163 (1st cir.), the court "does not therefore require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life threatening one."

In the above case, the prisoner was suffering from a body disfigurement that contorted his body causing him physical and emotional pain. Though my body is not contorted, I feel that my body is being disfigured because of my sensitivity to testosterone. This causes me serious woe to the contemplation of suicide or self castration.

In Spruill v Gillis 372 F 3d 218, 235 (3rd cir. 2004)(internal citation omitted), it says, "The Eighth Amendment is violated when prison authorities expose inmates to 'undue suffering' by denying reasonable requests for medical treatment.'" Quoted in Greeno v Daley 414 F 3d 645, 655 (7th cir.)

Also, in Fields v Smith 653 F 3d 550 (7th cir. February 7, 2011), they said, "It is well established that the US constitution's ban on cruel and unusual punishment does not permit a state to deny effective treatment for the serious medical needs of prisoners." The US Supreme Court articulated this in Estelle v Gamble.

I contend that I am not receiving effective treatment for my gender dysphoria. The secondary mae characteristics cause me mental pain and suffering, which amounts to woe. A simple change to brand name drugs is a reasonable request.

"Refusing to provide effective treatment for a serious medical condition serves no penological purpose and amounts to torture." See Roe v Elyea 631 F 3d 843, 861-63 (7th cir. 2001).

The last five and a half years have been excruciatingly stressful. The degradation of my feminized self has been at the forefront of my life. Every moment of every day has been a battle to cope with. I cannot adequately express to His Honor how real and truthful I am regarding this medication issue. These male characteristics are harming me, preventing any level of mental stability I need. These constant battles with my body's deficiencies and the inability to cope with normal everyday prison life causes me severe depression and anguish. In effect it is tortuous.

In Spruill v Gillis 372 F 3d 218, 235 (3rd cir. 2004), "[Eighth Amendment] violations include the denial of reasonable requests for medical treatment where the denial exposes the prisoner to undue suffering or the threat of tangible residual injury: and the intentional refusal to provide care in cases where the need for medical care is known."

It is not an unreasonable request for a prescription for brand name meds where the need exsists. The therapeutic response

of the generic drugs is poor at best. The request is in no way "frivolous". I know what my body does as a result of these generic drugs and can only offer the subjective prong... The DOC has heard numerous complaints of mine through both sick slips and mental health visits, which have been reported in the GID committee meetings.

The requirements I must meet in order to be on hormone therapy are, "1, The capacity to make informed treatment decisions. 2, Reasonable control over any medical and mental health concerns." <u>Soneeya v Spencer</u> at page 5.

I have the capacity to make the informed treatment decisions; however, the GID committee gives me absolutely no control over any medical and mental health concerns.

The fact that I still suffer from the symptoms GID treatment is supposed to suppress is unconscionable. The DOC does not want to treat this condition as it is, let alone effectively. Their blatant disregard to my serious medical need is wanton at best.

In <u>Greeno v Daley 414 F 3d 645, 653</u> (7th 2005) (internal citation omitted), it said, "Officials must know of and disregard an excessive risk to inmate health; indeed they must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw the inference. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. Additionally, a factfinder may conclude that a prison official knew of a substantial risk from the very fact the risk was obvious."

"Although it is true that neither medical malpractice nor disagreement with a doctor's medical judgement amounts to deliberate indifference, to prevail on an Eighth Amendment claim a prisoner is not required to show that he was literally ignored. (internal citation omitted), <u>414 F 3d 653</u>.

(13)

The question will always be, "If I am on the country's most popular and effective anti-androgens, and on their appropriate doses, then why is it I continue to suffer from those very same symptoms the country's most popular and effective drugs are confirmed to suppress?

Respectfully submitted to His Honor,

Christine M. Alexander, pro se

Dated: September 10, 2012

Certificate of service

I hereby certify that this document has been filed on September _( (_, 2012 via US mail, first class, and sent to all parties involved in Alexander v University of Mass. Medical School, et al.
Dated:

Christine M. Alexander